EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ARIZONA
 2
                Civil Action No. CV 16-08150 PCT-DLR
 3

 4
    Susan Ellsworth, Personally and
 5  as Personal Representative of
    the Estate of James Dennis
 6  Ellsworth, Jr.,

 7       Plaintiff,

 8       vs.

 9   United States of America,

10       Defendant.

11

12

13           Oral deposition of ELEANOR L.

14  HOLLINGSWORTH, PSYNP, held at the United States

15  Attorney's Office, 1200 Two Renaissance Square, 40

16  North Central Avenue, Phoenix, Arizona 85004, on

17  Wednesday, July 26, 2017, commencing at 1:00 p.m.,

18  before David M. Lee, Registered Merit Reporter,

19  Arizona Certified Reporter Certificate Number 50391.

20

21

22

23

24

25
```

```
 1   APPEARANCES:
 2   RAPPAPORT, GLASS, LEVINE & ZULLO
 3   BY:   THOMAS P. VALET, ESQUIRE
 4   tvalet@rapplaw.com
 5   1355 Motor Parkway
 6   Islandia, New York 11749
 7   631-293-2300, Extension 103
 8
 9   LAW OFFICE OF JEANNE ANNE STEFFIN
10   BY:   JEANNE ANNE STEFFIN, ESQUIRE
11   jsteffin@steffin.com
12   626 North Garfield Avenue, Suite A
13   Alhambra, California 91801
14   626-235-1173
15
16   LAW OFFICE OF ERIN STEFFIN
17   BY:   ERIN STEFFIN, ESQUIRE
18   esteffin@gmail.com
19   3260 North Hayden Road, Suite 210
20   Scottsdale, Arizona 85251
21   480-285-8259
22         Counsel for Plaintiff
23
24
25   APPEARANCES CONTINUED:
```

```
 1   APPEARANCES CONTINUES:
 2
 3   UNITED STATES ATTORNEY'S OFFICE
 4   UNITED STATES DEPARTMENT OF JUSTICE
 5   BY:   COLEEN P. SCHOCH, ASSISTANT UNITED STATES
 6   ATTORNEY, DISTRICT OF ARIZONA
 7   coleen.schoch@usdoj.gov
 8   Two Renaissance Square
 9   40 North Central Avenue, Suite 1200
10   Phoenix, Arizona 85004
11   602-514-7659
12         Counsel for Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ORAL DEPOSITION OF ELEANOR L. HOLLINGSWORTH, 7/26/2017

```
 1                    EXAMINATION INDEX
 2        ELEANOR L. HOLLINGSWORTH
 3           BY MR. VALET                              5
 4           BY MS. SCHOCH                           132
 5
 6
 7
 8                  (NO EXHIBITS MARKED)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                ELEANOR L. HOLLINGSWORTH, PSYNP
2          Q.    In August of 2014 were you
3    working?
4          A.    Yes.
5          Q.    Okay.  And where were you working at that
6    time?
7          A.    I was working for the Northern Arizona VA
8    healthcare facility.
9          Q.    Were you a United States Government
10   employee at that time?
11         A.    Yes.
12         Q.    And for how long had you been a government
13   employee working for the VA system?
14         A.    I began employment, I believe, on December
15   10th, 2010.
16         Q.    So in December of 2010.  Is that the first
17   time you worked at any VA?
18         A.    Yes.
19         Q.    Are you a nurse practitioner?
20         A.    Yes.
21         Q.    And could you tell me a little bit about
22   your educational background, starting with nursing
23   school?
24         A.    I started in nursing school with Yavapai
25   College in Prescott, where I earned an L.P.N. license,

ELEANOR L. HOLLINGSWORTH, PSYNP

1          going on to a R.N. license, and from -- and I
2          graduated there in 1995.  I graduated with a
3          Bachelor's of Nursing in 1997 from NAU, and I
4          graduated with my Master's of Nursing with an emphasis
5          as a Psychiatric Nurse Practitioner from Arizona State
6          University in 2000.  Since then I've earned at least
7          30 C.M.E.'s per year to maintain my license.
8               Q.  So what year was it that you got your
9          L.P.N. license?
10              A.  My L.P.N. was in 1994.
11              Q.  And your R.N. license, what year was that?
12         I'm sorry.
13              A.  1995.
14              Q.  From 1994 through 2000, when you got your
15         Master's Degree, were you in school the entire time,
16         or did you practice as a nurse in that time period, or
17         both?
18              A.  I did both.
19              Q.  Maybe it would be easier to work backwards
20         if we could then.
21              You joined the VA, you told me, in December
22         of 2010.  Were you working before you joined the VA as
23         a nurse?
24              A.  Yes.

1       ELEANOR L. HOLLINGSWORTH, PSYNP
2  VA in this timeframe when you first joined there, were
3  these patients that you were seeing, this panel of
4  patients, assigned exclusively to you?  In other
5  words, each time they came to the VA would they see
6  you, or would it depend on who was working on a
7  particular day?
8       A.  Once that patient was assigned to me, I
9  would see that patient.
10      Q.  All right.  So if they scheduled a future
11 appointment to come back, they would then see you;
12 correct?
13      A.  Uh-huh.
14      Q.  At some point did your job responsibilities
15 change at the VA?
16      A.  Yes.
17      Q.  When was that and what change was it?  You
18 can approximate.
19      A.  Okay.  Approximately 15 months later I was
20 assigned to the crisis team.  I was also asked to
21 carry a small panel of patients.
22      Q.  What is the crisis team, or what was it
23 back in 2011?
24      A.  It was for anyone that did not have a
25 regular provider who came in needing services, anyone

1        ELEANOR L. HOLLINGSWORTH, PSYNP
2   who had just moved to the area, and anyone who came in
3   that was suicidal or homicidal.
4        Q.  Okay.  And did your job responsibilities at
5    the VA ever change again after you joined --
6        A.  Yes.
7        Q.  -- the crisis team?
8        A.  Yes.
9        Q.  Okay.  When did it change and how did it
10   change?
11       A.  It changed again in September 2014.
12       Q.  And how did your job responsibilities
13    change at that time?
14       A.  I was assigned to the Domiciliary.  I was
15   completely taken out of that building and assigned to
16   the Domiciliary, and I was responsible for the mental
17   healthcare of 420 people, which doesn't sound like
18   much, but these people are pretty ill.
19       Q.  All right.  So what is the Domiciliary?
20       A.  It's a very structured, high-intensity
21   treatment facility.  It is a 190-day or 120-day
22   treatment facility.
23       Q.  So is it inpatient care?
24       A.  Yes.
25       Q.  And is it exclusively for mental health

                ELEANOR L. HOLLINGSWORTH, PSYNP

1  until the time that you left, did the Domiciliary ever
2  get a psychiatrist assigned to it?
3       A.   Yes.
4       Q.   When was that, for the first time?
5       A.   That was in January 2015.
6       Q.   And the psychiatrists that you've mentioned
7  so far are Dr. Sadowski, Dr. Ruekberg, and
8  Dr. Grindlinger.  During the time that you worked at
9  the Prescott facility did those psychiatrists also
10 have patient responsibilities in the mental health
11 building?
12      A.   Yes.
13      Q.   In August of 2014 would you tell me who the
14 psychiatrists were that were working in the mental
15 health building?
16      A.   Dr. McInnon.  In August, Dr. McInnon.
17 Dr. Sadowski was seeing some patients.  I don't
18 believe Dr. Scherz was still there.  I can't remember
19 when -- there was a change in the Medical Director
20 somewhere in there, and I can't remember when
21 Dr. Anthony came in and when Dr. Scherz left, but both
22 of them had a limited number of patients.
23 Dr. Ruekberg had left.  The psychiatrist prior to
24 Dr. Sadowski in the Dom was Dr. Adkins, and he had

```
 1              ELEANOR L. HOLLINGSWORTH, PSYNP
 2              And the reason that you saw him on August
 3    8th related to some medication that he was taking that
 4    he thought he had a reaction to?
 5         A.   Paxil.
 6         Q.   Did you perform a mental health evaluation
 7    on Mr. Ellsworth on August 8th, 2012?
 8         A.   I did a Mental Status Exam.
 9         Q.   And is that different from a mental
10    health --
11         A.   A mental -- you're not going to do a full
12    psychiatric evaluation every time you see a patient,
13    and this was a patient of Dr. Scherz, I believe, at
14    that time.
15              Actually, he was in transition to see
16    Dr. Grindlinger.
17         Q.   When you say "transition," he was being
18    reassigned --
19         A.   He was being reassigned, because if you
20    look at my "Plan," two pages over --
21              Well, two pages?
22              No, one page over.  One page over.
23              I made sure that he was going to see me in
24    11 days, or soon.  In 11 days I had him come back to
25    see me, and then I also had him going to see
```

ELEANOR L. HOLLINGSWORTH, PSYNP

by then, so he was in a structured environment at that time.

I called the Dom and told them he was a no-show, and sent -- I informed the Dom Chief, informed Dom nursing, and Dr. Sadowski and Dr. Scherz. I scheduled him for labs again, and then I asked them to schedule him for an appointment with me, or with Dr. Scherz or Dr. Sadowski once we got his labs. I think there is only one more after that.

Q. And do you know whether or not he followed up with Dr. Sadowski, as you just referenced?

A. I don't know.

Q. All right. That's fine.

Did you see Mr. Ellsworth --

A. One more time.

Q. -- in 2014?

A. Right.

Q. All right. What's the date of your visit with him in 2014?

A. August 4th.

Q. All right. Did you make a note, an electronic note in the chart for that visit?

A. Yeah, 000691.

Q. And what is the reason that you saw James

ELEANOR L. HOLLINGSWORTH, PSYNP

Ellsworth on August 4, 2014?

A. "Patient seen in crisis. Walk-in due to escalating psychosis."

Q. When you reference "crisis walk-in" in your note of August 4th, did James Ellsworth come to Building 155?

A. (Nods.)

Q. That's your understanding?

A. Uh-huh.

Q. In other words, he wasn't seen by anyone else at the VA before coming to Building 155.

A. I'm not aware of that.

Q. All right. And in the ordinary custom and practice of Building 155 back in August of 2014, would the procedure that you previously described have been followed?  In other words, the patient walking in in crisis would have seen a person in reception, and filled out some paperwork before being seen by someone?

A. Uh-huh.

Q. Yes?

What becomes of the paper that a patient would fill out when they're seen in crisis back in the 2014 timeframe?

ELEANOR L. HOLLINGSWORTH, PSYNP

1  
2  questions about this, but the discussions that you are
3  referencing about you being told to take over the
4  Domiciliary Program, did those discussions with other
5  people at the VA take place prior to August the 4th,
6  2014?
7      A.  Yes.
8      Q.  All right.  Thank you.
9      A.  I did what I was told.
10     Q.  All right.  So when you saw James Ellsworth
11 on August 4th, 2014, I believe you mentioned your
12 custom and practice would have been to look at the
13 previous mental health note.
14     A.  Yes.
15     Q.  In this case, Dr. Ruekberg.
16         Do you know when Dr. Ruekberg had last seen
17 James Ellsworth before August 4th, 2014?  Only if you
18 know.
19     A.  No.
20     Q.  It's something that you would have known on
21 August 4th.
22     A.  Yes.
23     Q.  And I think I asked you this already, but
24 do you know when Dr. Ruekberg left the VA?
25     A.  July.

```
 1                ELEANOR L. HOLLINGSWORTH, PSYNP
 2         Q.   July of 2014?
 3         A.   Uh-huh.
 4         Q.   Okay.  On August 4th, 2014, would you have
 5   known, as a matter of custom and practice, when James
 6   Ellsworth had last seen a mental health provider at
 7   the VA?
 8         A.   Yes, I would have.
 9         Q.   Just continuing with your note, still on
10   the first page of your note, page 691, "Diagnoses and
11   Problems Treated This Visit."  It's the first --
12         A.   It's right here (indicating).
13         Q.   Yeah.
14              MR. VALET:  Off the record for a second.
15              (The deposition recessed from 4:08 p.m.
16    to 4:10 p.m.)
17   BY MR. VALET:
18         Q.   Okay.  Under that heading --
19         A.   Yeah.
20         Q.   -- "Diagnoses And Problems Treated This
21   Visit," what have you typed in there or entered in
22   there?
23         A.   Well, what do I have typed in there?  I'm
24   sorry.
25         Q.   Yeah.
```

1      ELEANOR L. HOLLINGSWORTH, PSYNP
2  have in terms of Mr. Ellsworth's mental health
3  condition and treatment that he didn't pick up his
4  medications?
5       A.  Well, I don't think he was going to get
6  better.
7       Q.  Did that also carry with it the risk that
8  his mental health condition would deteriorate?
9       A.  Probably.
10      Q.  Well, when did you first become aware that
11 he had not picked up the medications that he was
12 prescribed on August 4th?
13      A.  Today.
14      Q.  I see.
15          In your note you reference the fact that
16 Mr. Ellsworth had -- you wrote "He has not taken his
17 psychiatric medications since December 2013."  Do you
18 see that?
19      A.  Uh-huh.
20      Q.  Did you discuss with James Ellsworth on
21 August 4th why he had not taken his medications since
22 December 2013?
23      A.  I'm sure I did, but it does not say it.
24          Okay.  I can't recollect at this time.
25      Q.  All right.  Among the medications that had

ELEANOR L. HOLLINGSWORTH, PSYNP

2  history of saying that they're suicidal, you need to
3  take that seriously.  I do think you need to take that
4  seriously.
5       Q.  Okay.
6       A.  However, if a person has a history of using
7  substances, particularly alcohol or bath salts, it's
8  going to take a minimum of four to six months for
9  their frame to reset and for their mood to reset.
10          What I'm saying to you is when I put in
11 "Mood Disorder, not otherwise specified," that's why I
12 put that in, because I don't feel comfortable putting
13 in "Bipolar," because he's been using other things.  I
14 don't think it's fair for her to put in whatever.  I
15 think that yes, he may have been using other things
16 the last time I saw him, but I don't know.  I don't
17 remember this man.
18      Q.  Did you, on August 4th, discuss with him
19 whether he was using drugs?
20      A.  I don't remember.
21      Q.  All right.  You indicated in a previous
22 answer that you reassigned Mr. Ellsworth to a
23 healthcare provider on August 4th.
24      A.  Yes.
25      Q.  That was Ms. Malone.

                 ELEANOR L. HOLLINGSWORTH, PSYNP

 2       A.   Uh-huh.
 3       Q.   Is she a psychiatric nurse --
 4       A.   Uh-huh.
 5       Q.   -- practitioner like you?
 6       A.   Uh-huh.
 7       Q.   Your note of August 4th refers to that
 8   reassignment; correct?
 9       A.   Right.
10       Q.   "Have reassigned Mr. Ellsworth to
11   Ms. Malone.  Appointment made."  Do you see that?
12       A.   Yes.
13       Q.   All right.  And then in another answer you
14   indicated that he was to be seen three days after
15   August 4th.  Is that correct?
16       A.   Correct.
17       Q.   Is it indicated in the chart the date of
18   the appointment that you made for him to see
19   Ms. Malone?
20       A.   It was three days later.
21       Q.   What's the basis of that answer?
22       A.   The medical record.
23       Q.   And what medical record are you referring
24   to?
25            MS. SCHOCH:  There is a prescription -- or,

```
 1         ELEANOR L. HOLLINGSWORTH, PSYNP
 2                WITNESS CERTIFICATION
 3         I hereby certify that I have read the
 4    foregoing transcript of my deposition testimony, and
 5    that my answers to the questions propounded, with the
 6    attached corrections or changes, if any, are true and
 7    correct.
 8
 9
10
11
12
13
14    8/18/17    Eleanor L. Hollingsworth, PsyNP
      DATE       ELEANOR L. HOLLINGSWORTH, PSYNP
15
16
17
18    Eleanor L. Hollingsworth PsyNP.
      PRINTED NAME
19
20
21    FILE 13151
22    Susan Ellsworth, ET AL
23    vs.
24    United States of America
25
```


advanced depositions

855.204.8184    733 3rd Avenue, 16th Floor • New York, NY 10017    215.751.0581
PHONE           www.advanceddepo-jdr.com                            FAX


**advanced depositions**

855.204.8184
PHONE

733 3rd Avenue, 16th Floor, New York, NY 10017
www.advanceddepo-jdr.com

215.751.0581
FAX

**INSTRUCTIONS TO DEPONENT:** In accordance with the Rules of Civil Procedure, reproduced on the reverse side for your information, a copy of your deposition is attached for your inspection and signature. Any changes in the deposition in form or substance which you desire to make are to be made on this sheet with your reasons therefor.
**DO NOT WRITE ON THE DEPOSITION TRANSCRIPT ITSELF.**

| Page | Line | Change or correction and reason |
|---|---|---|
| 10 | 20 | Should be "inpatient unit" not "the clinic" (inaccurate as it stands) |
| 12 | 11 | Typo - should be "For how long" not "Hor how long" |
| 13 | 14 | Confusing: "practitioner and as an L.P.N. in psychiatry..." (add a word) |
| 16 | 17 | Should be: "120 people" not "420 people" |
| 16 | 21 | Corrected to a 90-day or 120-day (not 190) |
| 17 | 5 | Clarity: for their mental health |
| 18 | 16 | ~~Clar~~ Correction to a name: Dr. Artur Sadowski |
| 22 | 17 | DR. McKinnon not McInnon also on page 36 line 6 |
| 26 | 5 | |
| ~~38~~ | ~~to~~ | |
| 75 | 18 | "Polysubstance abuse," how this term is written in lit |
| 82 | 21 + 22 | should be "he doesn't have" (typo) |
| 85 | 11 | Should be "Depakote" not Deprakote misspell |
| 85 | 10, 25 | Should be "Divalproex" not Diprovalproex |
| 86 | 11 | Should be "Depakote" not Depracote |
| 86 | 12 | Should be "Divalproex" not Diprovalproex |
| 87 | 20 | Should be "Depakote" and "Divalproex" |
| 100 | 2 | referring to a French term on page 99 "soup de jour" should be "jour" |
| 102 | 15 | should be "accurately" People who are psychotic really do not see accurately |

I have inspected and read my deposition as captioned above and have listed all changes and corrections above, along with my reasons therefor.

8/18/17
Date

*[signature]* Eleanor _____, APRN
Signature of Deponent