# EXHIBIT A

Dr. Sporty – October 25, 2015 Report

# *Lawrence D. Sporty, M.D.*
### *2021 East Fourth Street, Suite 118*
### *Santa Ana, Ca. 92705*
### 714-285-0870
### October 25, 2015

Law Offices of Erin Steffin

                                              Re: James D. Ellsworth, Jr.

Dear Ms. Steffin,

I have now had the opportunity to review the medical records you provided to me regarding the care and treatment of James Ellsworth Jr. from the Northern Arizona HCS of the Veterans' Affairs program. The records are dated from August 2013 until September 9th, 2014. Mr. Ellsworth committed suicide on 9/6/2014.

While it is not automatically the fault of the treating institution that a patient commits suicide, it is standard practice to review the patient's care and treatment to see if the treatment meets the appropriate standard of care. If the standard of care is not met, then an opinion has to be formed as to whether or not those deviations from the standard of care were in some way contributory to the patient's suicide. The medical records in a case such as this are the basis for making such a determination, as they represent the clinical reasoning and judgements of the responsible caregivers during the patient's course of treatment in real time.

It is my opinion, based on the medical records that I have reviewed, that the appropriate standards of care were not met, and that these deviations for the standards or care were directly contributory to this patient's suicide. I recognize that additional information may yet be brought to light that may lead me to alter my position in the future. If such information becomes available, I will be happy to review it and reconsider my findings.

The bases of my opinions are listed below:

1. Mr. Ellsworth carried numerous psychiatric diagnoses, including Bipolar Disorder, Attention deficit disorder, Polysubstance abuse, Antisocial Personality Disorder, Cocaine, Bath Salts and Adderall Dependency, history of stimulant induced psychosis, Alcohol Abuse Disorder, high TSH secondary to Lithium treatment, social phobia, unspecified Anxiety Disorder, and Psychotic Disorder Unspecified.

2. Mr. Ellsworth had been prescribed multiple psychotropic medications, including Doxepin 25-50 mg at night, Trazadone 100 mg at night, hydroxyzine pamoate 50 mg as needed for sleep, lithium carbonate 300 mg capsules *3* each night, and risperidone 2 mg tabs ½ tablet at night. He had at one time been given synthroid due to a low TSH.

3. The records indicate that he had been treated by Bruce Ruekberg, a V.A. psychiatrist. *I can find only two notes in these records by this psychiatrist, a 20 minute visit on September 17th 2013 (page 265) and again on December 10th, 2013 for an unspecified length of time (page 205). There are no other records of his being seen by a psychiatrist or having his medications re-evaluated since that last visit. There is a note that at some time after this last visit, Dr. Ruekberg left the V.A. (Page 121). There is no record that this patient was ever assigned another psychiatrist. The standard of care is for the psychiatrist to see the patient at least every three months, and of course, more often as needed.*

4. The patient was seen on 8/4/2014 by a mental health nurse practitioner as" a crisis walk in due to escalating psychosis." It was reported that the patient had not taken his psychiatric medications since December 2013. (Perhaps this is about the time his psychiatrist left the VA, but this is speculative.) He was noted to have significant paranoia, delusional thinking that other were talking/laughing about him, and auditory hallucinations "which he does not elaborate about." He had difficulty falling and staying asleep. He was "irritable" with racing thoughts "verbally aggressive and occasionally punching something but not doing too much property damage." "He was advised to restart his medications. "He was advised to call earlier, come as a walk in, call 911 or hotline or go directly to the ED in case of symptoms getting worse." *The medications listed for him to take were listed. However, the Lithium dose he was directed to take was*

*only 300 mg one pill at night, not the 3 pills at night his psychiatrist had him taking. This is highly significant as this dose is too low to be effective, and his psychiatrist had documented in his 2013 note that the lithium blood levels were therapeutic at the 900 mg he had been prescribing. In spite of his agitated and psychotic state, no psychiatrist saw him at this visit, no thought of hospitalization is apparent, and there was no exploration as to why he had stopped his medications, nor was the nature of the auditory hallucinations explored. While the note states "He will be assigned to a new psych provider" there is no indication in the note that this was done. (Page 121.)*

5. On September 4th the patient presented to the emergency department at about 10 PM complaining of anxiety and the inability to sleep. He reported that he still was not taking his medications, and that he had not slept in days. He reported auditory hallucinations and "his paranoia seems worse today." A note on page 114 reports his describing "bad paranoia." *Again, the patient was not seen by a psychiatrist, hospitalization was not considered, and there is no attempt to understand the reasons for his medication non-compliance, and the details of his paranoia and hallucinations were never explored. He was only asked if he was suicidal or had a gun. This evaluation is below the standard of care for a comprehensive psychiatric examination. For example ,oftentimes patients experience command auditory hallucinations to kill themselves or to die, which impart high suicide risk, but since they are experienced by the patient as hallucinations coming from outside of himself, the patient himself will deny any suicidal ideation. The very fact that this patient was clinically deteriorating, had already not taken his medications after being directed to do so on 8/4was enough reason to hospitalize him. Suicide correlates highly with chronic insomnia, chronic anxiety, psychotic symptoms, and the failure to clinically improve after asking for help. He had enough symptoms to consider him a high suicide risk from a psychiatric point of view, whether or not he actually expresses suicidal ideation. The standard of care requires far more of a detailed evaluation than was done.*

6. *Lithium is a treatment of choice for Bipolar disorder. In fact it has specific and documented anti-suicidal properties. However it is ineffective if the dose is too low. That is why blood levels are part of the standard of care for the use of this medication. A dose of 300 mg is too low to have any clinically meaningful effect, and the treating*

*staff erred in not realizing they were not giving him the dose his psychiatrist had already established was effective for him.*

7. *These psychotropic agents (lithium and risperidone) take days to work. They do not work immediately, and no-one explained this to the patient. If he had indeed taken the medication as directed, he would have been no better clinically on 9/6, he would have continued to have paranoia, hallucinations, would continue to believe people were talking about him and laughing at him. He could easily have decided on his own that the medications were not going to work, and that he would never get better, and this would have led him to kill himself to end his suffering.*

8. Finally, the administrative note of September 8th indicated that the "Level of intent was low."(Page 105). How is this evaluation possible when the reports show that he hung himself, and had nailed the door shut? This is a high level of intent. On page 108 is a note that the patient's roommate was "disgruntled." This is not explored. Was there unrecognized conflict between the patient and the roommate, or was there some other reason for this?

If you have any questions or have additional information for me to review, please let me know.

Sincerely,

*[signature]*